RUSSELL C. JAY AND JUNE A. JAY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Jay v. Commissioner
Docket Nos. 3362-85; 12700-85; 12705-85; 24950-85; 44006-85.
United States Tax Court
T.C. Memo 1988-232; 1988 Tax Ct. Memo LEXIS 260; 55 T.C.M. (CCH) 933; T.C.M. (RIA) 88232; May 23, 1988. *260 Ps made contributions to a research fund maintained by EACB, a corporation formed to develop, produce, and market a motor vehicle powered by electricity. Under the terms of agreements between Ps and EACB, Ps would receive, in exchange for their contributions to the research fund, royalties for each electric vehicle sold by EACB for ultimate use or resale in the State of California. The agreements provided Ps with no ownership rights to any technology financed by their contributions and no power to direct the research conducted by EACB or its subcontractors. Further, the agreements called for Ps to make their entire contributions to the research fund in advance. Finally, such agreements provided no time schedule for the performance of research and imposed no requirement that EACB report to Ps as research was conducted. Held: (1) Ps' contributions to the research fund for research and development were not made in connection with a trade or business within the meaning of sec. 174(a), I.R.C. 1954, and therefore are not deductible under such section. (2) Ps are liable for the addition to tax for negligence under sec. 6653(a) and sec. 6653(a)(1) and (a)(2), I.R.C. 1954. *261 (3) Ps are subject to the increased rate of interest under sec. 6621(c), I.R.C. 1954. *262 Robert T. Gilleran, for the petitioners. Joseph R. Goeke and Joel E. Helke, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in, and additions to, the petitioners' Federal income taxes as follows: Additions to Tax
Sec. 6653(a)
Petitioner
Year
Deficiency
[2] I.R.C. 1954 Russell C. Jay
1980
$ 137,256.00
$ 6,863.00
and June A. Jay
1981
232,919.00
--
Josef Ben-Porat
1980
18,776.00
938.00
and Claire Ben-Porat
1981
27,300.00
--
Ben Rochelle and
1980
173,943.00
8,697.15
Estate of Jane
Beebe Rochelle,
Deceased,
1981
346,636.46
--
Ben Rochelle,
Executor
Gerald P. Baron
1980
23,715.65
1,185,78
and Bonnie Baron
1981
23,412.73
--
Irvin L. Morhar
1980
8,045.00
402.25
and Janet Morhar
1981
8,311.00
--
*263 Sec. 6653(a)(1)
Sec. 6653(a)(2)
Petitioner
I.R.C. 1954
I.R.C. 1954
Russell C. Jay
--
--
and June A. Jay
50% of interest
due on
$ 11,646.00 $ 232,919.00
Josef Ben-Porat
--
--
and Claire Ben-Porat
50% of interest
due on
1,365.00 $ 27,300.00
Ben Rochelle and
--
--
Estate of Jane
50% of interest
Beebe Rochelle,
due on
Deceased,
17,331.82 $ 346,636.46
Ben Rochelle,
Executor
Gerald P. Baron
--
--
and Bonnie Baron
50% of interest
due on
1,170.64 $ 23,412.73
Irvin L. Morhar
--
--
and Janet Morhar
50% of interest
due on
415.55 $ 8,311.00
In addition, the Commissioner determined, either by notice of deficiency or by amending its answer, that part of the deficiency owed by each of the petitioners was attributable to tax motivated transactions and subject to the increased rate of interest on deficiencies under section 6621(c). [3] The issues for our decision are: (1) Whether the payments made by the petitioners in 1980 and 1981 were in connection with a trade or business *264 and therefore are deductible as expenditures for research and experimentation under section 174; (2) whether the petitioners are subject to the addition to tax for negligence under section 6653(a) for 1980 and section 6653(a)(1) and (a)(2) for 1981; and (3) whether the deductions claimed by the petitioners with respect to their alleged research and development activities resulted in substantial underpayments of tax attributable to tax motivated transactions, within the meaning of section 6621(c) and are liable for the increased rate of interest under that section. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. At the time the petitions were filed in this case, petitioners Russell C. and June A. Jay, husband and wife, maintained *265 their legal residence in Corona Del Mar, California, petitioners Josef and Claire Ben-Porat, husband and wife, maintained their legal residence in Van Nuys, California; petitioner Ben Rochelle, both in his individual capacity and in his capacity as the executor of the Estate of Jane Beebe Rochelle, maintained his legal residence in Los Angeles, California; petitioners Gerald and Bonnie Baron, husband and wife, maintained their legal residence in Chatsworth, California; and petitioners Irvin and Janet Morhar, husband and wife, maintained their legal residence in Studio City, California. The petitioners filed their Federal income tax returns for the years in issue with the Internal Revenue Service Center at Fresno, California. Until 1957, Mr. and Mrs. Jay performed together as acrobats. Mr. and Mrs. Rochelle performed together as a dance team and appeared in motion pictures. After retiring from show business, Mr. Jay and Mr. Rochelle formed a real estate partnership with another individual. The partnership became active and very successful as the developer and owner of shopping centers, motels, and mobile home parks. Mr. Ben-Porat was a stockbroker with a brokerage firm in Los *266 Angeles, California. He also wrote and published his own investment advisory newsletter. Mr. Baron owned an insurance agency for many years. Mr. Morhar worked for the County of Los Angeles. For a time, he served as the Road Commissioner for the County of Los Angeles. The issues in this case result from the petitioners' involvement in transactions purportedly designated to lead to the development, manufacture, and marketing of a vehicle powered by electricity. In the 1970s, concern arose that the nation's reliance on imported oil for its energy needs had become a serious drain on the economy and posed a significant threat to national security. At the time, it was proposed that one solution to the problem was the increased use of vehicles which were totally or partially powered by electricity. Although similar in basic design to conventional gasoline-powered vehicles, electric vehicles are powered by electric energy stored in batteries. The use of electric vehicles offers the opportunity for significant oil savings, since approximately 85 percent of all the nation's electricity is produced from fuels other than oil, such as coal or nuclear energy. In addition, electric vehicles *267 are considered to be quieter and to leave fewer harmful emissions in the environment than conventional vehicles. However, in the 1970s, the speed and range of electric vehicles was limited by the amount of electricity which could be stored in the batteries and converted through the propulsion system. The main technological obstacle to the commercialization of electric vehicles was the lack of a battery which could be charged quickly and provide power to drive the vehicle an acceptable distance between charges. Research and development efforts in the electric vehicle field were dominated by large corporations and research organizations, including General Motors, Ford, General Electric, and the Jet Propulsion Laboratories. However, smaller groups and even individuals were also active in the field. Robert R. Aronson has been involved in the production of batteries and electric vehicles for all of his adult life. From 1948 to 1965, he was in charge of several companies devoted to the development, manufacture, and marketing of lead-acid storage batteries. In 1966, Mr. Aronson formed Electric Fuel Propulsion, Incorporated (EFP), and built his first electric car, the Mars I. A *268 new battery developed by Mr. Aronson enabled the Mars I to travel 120 miles on a charge, to accelerate from zero to 40 miles per hour in 10 seconds, and to reach a top speed of 52 miles per hour. In January 1967, Mr. Aronson built his second electric car, the Mars II, which had a more advanced propulsion system and could be recharged more rapidly than other electric cars operating at that time. Tests revealed that the Mars II had a maximum range of 146 miles on a charge in steady driving and 73 miles in stop and go driving. Further efforts produced vehicles with progressively higher maximum speeds and better acceleration. Although the research and manufacturing facilities available to EFP did not match those of the large organizations active in the development of electric vehicles, Mr. Aronson was able to come up with a number of technical innovations, which he incorporated in the Mars series and other electric vehicles. Such innovations earned him respect in the field. Between 1966 and 1976, EFP built approximately 100 electric vehicles and sold them primarily to electric utility companies. However, the revenue from such sales was insufficient to cover the high development *269 costs of the vehicles. For such reason, by 1976, EFP had accumulated substantial net operating losses and was in financial difficulty. At such time, Robert Wenz, a shareholder and director of EFP, suggested to Mr. Aronson a method by which the corporation could obtain much-needed funds. Mr. Wenz proposed that EFP obtain financing by entering into a series of related development and license agreements (the 1976 transactions). In one representative transaction, a group of 10 individuals formed a subchapter S corporation. Such individuals purchased stock in such corporation for $ 437,500. They borrowed $ 375,000 of the purchase price of the stock from a commercial bank and executed promissory notes in favor of the bank secured only by the stock of the corporation. At the same time, EFP and the subchapter S corporation entered into a development agreement, in which EFP agreed to develop for the subchapter S corporation a product which could be used as a component in an electric vehicle. The development agreement provided that any invention produced as a result of EFP's efforts would become the property of the subchapter S corporation. EFP and the subchapter S corporation *270 also entered into a license agreement, in which the subchapter S corporation granted EFP a license to market the invention produced under the development agreement. The development agreement also provided that EFP would receive a fee of $ 437,500 for its efforts. EFP used $ 375,000 of the development fee to purchase certificates of deposit at the commercial bank which held the notes executed by the shareholders in the subchapter C corporation. EFP later used the proceeds of such certificates to purchase such notes from the bank. Thus, EFP received $ 62,500 in cash, before commissions and other expenses, as a result of such transaction. Mr. Aronson and Mr. Wenz were successful in attracting participants to enter into the 1976 transactions. However, most of the fees generated by such transactions were returned to the commercial bank by EFP to satisfy the loans issued to the participants. In addition, Mr. Wenz retained a portion of the cash received by EFP as his commission for arranging the transactions. As a result, EFP was left with only a small percentage of the fees received pursuant to the development agreement. Because Mr. Aronson felt that Mr. Wenz retained an unreasonably *271 large amount of cash as his commission, Mr. Aronson determined that it was not in EFP's interest to allow Mr. Wenz to promote the transactions after 1976. In 1977, Mr. Aronson shifted his attention toward developing a new electric vehicle, to be called the Silver Volt. In addition, he formed a new corporation, Electric Auto Corporation of Puerto Rico (EAPR), to take advantage of 10-year exemptions from income and property taxes offered by the Puerto Rican government to companies beginning operations there. Mr. Aronson determined that all research and development activities relating to the Silver Volt would be carried on through EAPR. At about the same time, Mr. Aronson decided to devise his own plan to attract the participation of outside parties in the research conducted by EAPR. He engaged Howard L. Braitman, who was associated with Price Waterhouse & Co., a large public accounting firm, to assist him in developing such a plan and to prepare a tax opinion on the proposed transactions. Pursuant to the plan developed by Mr. Braitman, EAPR took part in several different transactions. In one such transaction, EAPR entered into a series of development agreements with subchapter *272 S corporations, under which EAPR agreed to develop, in exchange for fees, specific products to be used as components in an electric vehicle. Under such agreements, each subchapter S corporation owned the rights to any such product developed. However, under a separate license agreement which EAPR and the subchapter S corporation executed contemporaneously with the development agreement, EAPR was granted the exclusive right to use such product in the electric vehicle it was developing. The shareholders in the subchapter S corporations borrowed from a commercial bank a portion of the funds used to purchase their shares in such corporations. The shareholders executed promissory notes in favor of the bank, and such notes were secured only by the shares in the subchapter S corporation. EAPR used a portion of the fees received under the development agreements equal to the amount borrowed to purchase the shareholders' promissory notes held by the bank. EAPR also entered into distributorship agreements with subchapter S corporations. In such agreements, the corporations were granted the right to distribute within a specified territory an electric vehicle produced by EAPR. In return, *273 such corporations made contributions to a general research fund established by EAPR. Similar to the shareholders of the corporations involved in the development agreements, the shareholders in the corporations involved in the distributorship agreements borrowed from a commercial bank a portion of the funds used to purchase shares in their corporation. Such shareholders executed promissory notes in favor of the bank, and such notes were secured by the stock in the corporations. EAPR used a portion of the proceeds received under the distributorship agreements equal to the amount borrowed to purchase the shareholders' promissory notes held by the bank. EAPR again used most of the fees received under the transactions to purchase the promissory notes executed by the participants. For such reason, the company was able to retain only a small percentage of such fees. It was suggested that EAPR would be left with more cash from future transactions if a third party could be found to make loans to participants in such transactions or to purchase promissory notes executed by such participants. Through an intermediary, Mr. Aronson met Peter (H. Y.) Wong, an accountant in Hong Kong, who *274 was acting as a representative of Mashand Investments Limited (Mashand), a Hong Kong investment company. In 1978 and in later years, Mr. Aronson entered into agreements with Mr. Wong under which Mashand would provide loans to participants in electric vehicle transactions. In 1977, Mr. Aronson met Robert T. Gilleran, an attorney practicing in Los Angeles, California, and told him of the EAPR transactions developed by Mr. Braitman. Mr. Aronson presented Mr. Gilleran with copies of the EAPR business plan and tax opinion prepared by Mr. Braitman, materials on EFP's and EAPR's business history, and information compiled by the United States Department of Energy on the potential market for electric vehicles. Mr. Aronson later sent Mr. Gilleran additional material relating to EAPR, including copies of the agreements in which Mashand agreed to loan funds to participants in the EAPR transactions. While Mr. Gilleran was interested in Mr. Aronson's activities, he did not participate in any EAPR transactions in 1977. In 1978, Mr. Aronson sent Mr. Gilleran additional materials relating to EAPR, including copies of other agreements between EAPR and Mashand. Mr. Gilleran reviewed such materials *275 and corresponded with Mr. Braitman concerning EAPR's business plan. At such time, Mr. Gilleran agreed to provide an opinion discussing the Federal income tax implications arising from the EAPR transactions. In addition, he agreed to promote the EAPR transactions to others. Finally, he agreed, in the event the positions taken by participants in such transactions on their Federal income tax returns were challenged, that he would represent such participants in any proceedings before the Internal Revenue Service and in this Court. In exchange, he received a fee for each transaction entered into by the participants. In August 1978, Mr. Gilleran met Bernard Kurtin, a certified public accountant who owned a tax return preparation service, and Sol Gerber, an automobile dealer and businessman. Both Mr. Kurtin and Mr. Gerber expressed interest in the EAPR transactions. With Mr. Aronson's permission, Mr. Gilleran made available to Mr. Kurtin and Mr. Gerber all his materials relating to EAPR. Mr. Kurtin reviewed the materials he received from Mr. Gilleran relating to EAPR and spoke with Mr. Braitman concerning EAPR's business plan. Mr. Kurtin also spoke with experts in the area of *276 electric vehicles, who assured him that Mr. Aronson was respected in the field. In addition, Mr. Gerber asked his son Richard, who was an electronics engineer, to visit EAPR's facility. When he did so, Richard found that the facility was in the very early stages of developing the Silver Volt. He determined that EFP had not produced a drivable prototype of the Silver Volt at the time of his visit. After considering the materials relating to EAPR and after talking with Richard Gerber and others, Mr. Kurtin decided to participate in the 1978 transactions. In addition, he agreed to promote the transactions to others. In exchange for his efforts, it was agreed that he would receive a commission equal to 20 percent of the cash paid by each participant he persuaded to enter into a transaction. Mr. Kurtin recommended the 1978 transactions to Mr. Jay, Mr. Rochelle, and Mr. Ben-Porat. In 1978, Mr. Jay and Mr. Rochelle, both acting on Mr. Kurtin's recommendation, purchased shares in Battery R & D Corporation. In 1978, Mr. Ben-Porat became a stockholder in Nickel Hydrogen Corporation. Such corporations were purportedly formed to develop products to be used in an electric vehicle. *277 In 1979, Mr. Aronson developed another set of transactions designed to finance EAPR's activities. The transactions contemplated for 1979 again called for individuals to purchase stock in subchapter S corporations. Such corporations in turn acquired rights in certain components or technological processes which Mr. Aronson thought useful to the development of the Silver Volt. Such corporations then entered into agreements with either EAPR or EFP which called for EAPR or EFP to develop such components or processes. The 1979 transactions differed from the prior transactions in one important respect. Because of changes in the Internal Revenue Code relating to non-recourse financing, Mr. Aronson deemed such financing to be inappropriate for transactions after 1978. [4] For such reason, the 1979 transactions called for the shareholders of the Subchapter S corporations to finance their contributions by selling options for the stock held by them to an unrelated company, Anglo-American Research Limited (AAR). AAR was a Bahamian company purportedly engaged in research and development activities. *278 All of the petitioners participated in the 1979 transactions. Mr. Jay and Mr. Ben-Porat purchased stock in Galvanic Battery Development Corporation, which was involved in developing a galvanic battery post for use in electric vehicles. Mr. Rochelle purchased stock in Gravity Fuel Gauge Development Corporation. In addition, Mr. Morhar became a shareholder in Battery Cycle Heating System Corporation. He had heard about Mr. Aronson's activities from his son Richard, who worked in Mr. Kurtin's office. Mr. Baron purchased stock in Electric Auto Controller Development Corporation. He had heard about the electric vehicle transactions from a co-worker in his office. After EAPR experienced delays in securing approval from the government of Puerto Rico for the anticipated exemptions from income and property tax, Mr. Aronson decided to locate his operations in the Bahamas. In 1979, Mr. Aronson formed Electric Auto Corporation of the Bahamas (Electric Auto) and secured facilities in an industrial area in the Bahamas. He decided that all efforts to develop the Silver Volt would be carried on through Electric Auto. The shareholders of EFP owned 49 percent of the outstanding shares of *279 Electric Auto, and an unidentified Bahamian entity owned 51 percent of such shares. In 1980, Mr. Aronson developed a different plan to obtain funds to finance Electric Auto's activities. He proposed that individuals make direct contributions to a research and development fund established by Electric Auto, in return for royalties based on the number of Silver Volts manufactured and sold by the company. In an effort to make the transaction more attractive to potential participants, Mr. Aronson and Electric Auto entered into an agreement with Artoc Bank and Trust Limited (Artoc). In a letter dated October 1, 1980, Artoc agreed to loan, through its subsidiary Comanche Investments N.V. (Comanche), up to $ 12,000,000 to parties interested in contributing to Electric Auto's research and development fund. In return for such agreement by Artoc, Electric Auto agreed to pay to Artoc a commission of 5 percent of the factory price of all electric vehicles sold by the company in California. In addition, Electric Auto agreed to maintain funds in a cash collateral account at Artoc sufficient to cover the loans made by Artoc through Comanche. In 1980, all the petitioners participated in *280 the transactions promoted by Mr. Aronson. They executed research and development agreements with Electric Auto (the 1980 agreements) which were identical in all respects, except for the date of execution, the amount contributed by each petitioner, and the amount of royalties to be received by each petitioner. The 1980 agreements provided in part: WHEREAS, Electric Auto is engaged in the business of developing and proposes to manufacture a quality motor vehicle, powered by an electric propulsion system, to be sold in the State of California, and WHEREAS, immediate and continuing efforts are required to fulfill the pressing needs of society for a pollution free and energy conserving electric vehicle; and WHEREAS, Electric Auto and contributor acknowledge that in order for an electric vehicle to be marketed on a commercially successful basis, it will be necessary to engage in an extensive and continuous program of research and development on the electric propulsion system components, batteries,motors, controllers,, and related charging equipment; and WHEREAS the research and development to be performed by Electric Auto as described hereunder will inure to the benefit of Electric *281 Auto and Contributor; NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, it is agreed as follows: 1. Payment by Contributor. In order to help assure that the research and development of the Electric Auto electric vehicle and related products will proceed in a timely manner, Contributor hereby agrees to participate in such research and development by paying to Electric Auto the sum of   Dollars, on the date hereof to defray a portion of the research and development costs. 2. Undertaking of Electric Auto. Electric Auto hereby agrees to use the amount paid by Contributor as set forth in Paragraph 1 in a continuing program of research and development covering the design, engineering, laboratory testing and experimental model construction of Electric Auto electrically powered vehicles and components and systems for same that will make electrically powered vehicles more practical for use in urban, suburban and highway driving applications (hereinafter sometimes collectively referred to as "products") according to the terms and conditions of this agreement. 3. Research and Development to be Conducted Pursuant to Exclusive Control and *282 Discretion of Electric Auto. All amounts paid to Electric Auto by Contributor for the purpose of research and development shall be expended according to the discretion of Electric Auto; and, all research and development performed under the terms of this Agreement may be performed according to the discretion of Electric Auto at Electric Auto's facilities in the Bahamas and/or at the facilities of sub-contractors in the Bahamas, Michigan or elsewhere and/or at any other facilities established by Electric Auto. It is hereby acknowledged and agreed by Contributor that Electric Auto does not represent or warrant that it will successful design or develop commercially marketable products or that it will develop same in a timely manner. Contributor hereby waives any claim for a refund of the payment made under this Agreement in the event that the research and development should not result in the development of marketable products. 4. No Ownership Interest. The payment made hereunder for research and development shall not be deemed to vest in the Contributor any ownership interest in the design, patents, or any other results of the research and development. It is hereby mutually *283 acknowledged and agreed that all proprietary and ownership interests in the results of the research and development shall be exclusively those of Electric Auto or its designee. 5. Use of Research and Development Fund. All amounts paid to Electric Auto by Contributor shall be used in conjunction with payments made by other Contributors to provide a research and development fund (hereinafter "fund"). Electric Auto shall draw against the fund in such amounts and at such times deemed reasonable by Electric Auto to conduct a systematic and ongoing research and development program; provided that, Electric Auto shall at all times remain obligated to expend the full equivalent paid by Contributor for the purpose of research and development as set forth in this Agreement, solely for those expenditures that will constitute charitable research and developmental expenditures to Contributor under § 174 of the Internal Revenue Code of 1954. Contributor and Electric Auto specifically agree, however, that Electric Auto shall not be required to escrow the amounts paid by Contributor under this Agreement prior to the use thereof as set forth in this Agreement; and, Electric *284 Auto is hereby permitted to invest all or any portion of the funds in reasonably prudent investments prior to the use thereof as set forth in this Agreement. All interest earned on invested funds shall be the property of Electric Auto and not subject to this Agreement. 6. Royalty Payments to Contributor. In consideration of the research and development payment referred to in Paragraph 1, above, Electric Auto will pay a royalty to the Contributor of $    , per new motor vehicle manufactured and sold by Electric Auto or a subsidiary of Electric Auto to any customer, Distributor, Dealer, Representative, or Agent of Electric Auto who purchases such new vehicle for ultimate use or resale in the State of California. Royalty payments will be made on the 15th day of March of each year following the year of sale by Electric Auto. Such royalty payments of $    per vehicle will be made from year to year until such time as the sum of all such royalty payments made shall equal $    , at which time, all subsequent royalty payments will be made at the rate of $    , per new motor vehicle manufactured and sold by Electric Auto or a subsidiary of Electric Auto for ultimate use *285 or resale in California. * * * Mr. Baron executed his copy of the 1980 agreement on December 3, 1980. He contributed $ 50,000.00 to the research fund, of which $ 40,000.00 was the proceeds of a loan from Comanche. [5] The agreement provided that he was entitled to receive royalties of $ 6.66 for each electric vehicle sold until he received $ 100,000.00 in royalty payments, after which time such royalties would be reduced to $ 3.33 per vehicle. Mr. Ben-Porat executed his copy of the 1980 agreement on November 21, 1980. He contributed $ 48,000.00 to the research fund, of which $ 36,000.00 was the proceeds of a loan received from Micam Holdings N.V. (Micam), a subsidiary of Mashand. He was entitled to receive royalties of $ 7.99 per electric vehicle sold until he received $ 96,000.00 in royalty payments, after which time such royalties would be reduced to $ 3.99 per vehicle. Mr. Jay executed his copy of the 1980 agreement on December 2, 1980. He contributed $ 100,000.00 *286 to the research fund, of which $ 80,000.00 was the proceeds of a loan received from Comanche. He was entitled to receive royalties of $ 13.32 per electric vehicle sold until he received $ 200,000.00 in royalty payments, after which time such royalties would be reduced to $ 6.66 per vehicle. Mr. Morhar executed his copy of the 1980 agreement on December 19, 1980. He contributed $ 25,000.00 to the research fund, of which $ 20,000.00 was the proceeds of a loan received from Comanche. He was entitled to receive royalties of $ 3.33 per electric vehicle sold until he received $ 50,000.00 in royalty payments, after which time such royalties would be reduced to $ 1.66 per vehicle. Mr. Rochelle executed his copy of the 1980 agreement on December 2, 1980. He contributed $ 250,000.00 to the research fund, of which $ 200,000.00 was the proceeds of a loan received from Comanche. He was entitled to receive royalties of $ 33.30 per electric vehicle sold until he received $ 500,000.00 in royalty payments, after which time such royalties would be reduced to $ 16.65 per vehicle. All the petitioners executed promissory notes to support the amounts they purportedly borrowed in 1980 from *287 Comanche or Micam. Messrs. Jay, Rochelle, Baron, and Morhar executed notes with Comanche. Such notes are identical for each petitioner, except for the date of maturity and the amount borrowed. Such notes provided: For value received, the undersigned,     (the Maker) promises to pay to the order of COMANCHE INVESTMENTS N.V. (the 'Payee') (a wholly owned subsidiary of Artoc Bank and Trust Limited of Nassau, Bahamas), or to order, the principal amount of     Dollars * * * (the 'Principal Amount') together with simple interest on the unpaid balance thereof determined at the rate of 12 percent per annum. On or after Ninety (90) days from the date hereof, the Maker may from time to time prepay without premium all or any portion of the amount to become due hereunder. Each prepayment shall be applied first to the principal and the remainder, if any, shall be applied to the accrued interest at the date of such prepayment. Prepayments shall be made out of the proceeds of all royalty payments received by the Maker from Electric Auto Corporation (Bahamas) Ltd. pursuant to a Research and Development Agreement between the maker and Electric Auto Corporation (Bahamas) Ltd. dated *288    , and attached hereto (Exhibit 1). The amount of such prepayments will be Fifty percent of all royalty payments which may become due to Maker under said Research and Development Agreement. The Maker will instruct Electric Auto Corporation (Bahamas) Ltd. to send all such prepayments directly to Comanche Investments N.V. The Payee covenants that this note is non-negotiable. Principal and interest on this Note is due on    , 1988. In the event this Note is not paid in full on its due date, then the balance of the Note will be paid at the rate of Ten (10) percent per year until it has been paid in full. The Maker hereby represents and warrants that he has a net worth in excess of $ 250,000.00 Dollars. The Maker hereby covenants that he will not sell or assign his rights under the above mentioned Research and Development Agreement without the prior written consent of the Payee. The notes also stated that "The Maker shall at all times be personally liable for the payment of the entire principal and interest hereof." Mr. Ben-Porat executed a promissory note to Micam on November 21, 1980. Such note provided: For value received, the undersigned Josef *289 Ben-Porat (maker) promises to pay to the order of MICAM HOLDINGS, N.V. the principal sum of $ 36,000 together with interest at twelve percent per annum. Principal and interest on this note is due November 21, 1988.
Payments shall be made out of fifty percent of all royalty payments which may become due to maker from Electric Auto Corp. (Bahamas) Ltd. pursuant to a Research and Development Agreement between the maker and Electric Auto Corp. (Bahamas) Ltd. dated November 21, 1980. The maker will instruct Electric Auto Corp. (Bahamas) Ltd. to send all such prepayments directly to MICAM HOLDINGS, N.V. In the event this note is not paid in full on its due date, then the balance of the note will be paid at the rate of ten (10%) percent of the principal balance per year until it has been paid in full. The maker will not be personally liable for the payment of interest hereof. Such not also stated that it was non-negotiable and non-assignable. Despite such fact, Mr. Ben-Porat received a letter in January 1982 which suggested that the note had been assigned to Comanche. The letter requested that Mr. Ben-Porat agree to assign to Comanche 100 percent, rather than 50 *290 percent, of any royalties received from Electric Auto upon the sale of Silver Volts. Mr Ben-Porat accepted such change on February 10, 1982. He never attempted to discover how the note executed by him was obtained by Comanche. In 1981, all the petitioners again chose to participate in the Electric Auto transactions. They again executed research and development agreements with Electric Auto (the 1981 agreements) which were identical in all respects, except for the date of execution, the amount contributed by each petitioner, and the amount of royalties to be received by each petitioner. The terms of the 1981 agreements were substantially the same as those in the 1980 agreements. Mr. Baron executed his copy of the 1981 agreement on August 4, 1981. He contributed $ 50,000.00 to the research fund, of which $ 40,000.00 was the proceeds of a loan received from Comanche. The agreement provided that he was entitled to receive royalties of $ 6.66 for each electric vehicle sold until he received $ 100,000.00 in royalty payments, at which time such royalties would be reduced to $ 3.33 per vehicle. Mr. Ben-Porat executed his copy of the 1981 agreement on July 13, 1981. He contributed *291 $ 65,000.00 to the research fund, of which $ 52,000.00 was the proceeds of a loan received from Comanche. He was entitled to receive royalties of $ 8.66 per electric vehicle sold until he received royalty payments of $ 130,000.00, at which time such royalties would be reduced to $ 4.33 per vehicle. Mr. Jay executed his copy of the 1981 agreement on July 14, 1981. He contributed $ 200,000.00 to the research fund, of which $ 160,000.00 was from the proceeds of a loan received from Comanche. He was entitled to receive royalties of $ 26.64 per electric vehicle sold until he received royalty payments of $ 400,000.00, at which time such royalties would be reduced to $ 13.32 per vehicle. Mr. Jay made an additional contribution to the research fund on November 5, 1981. He contributed an additional $ 100,000.00 to such fund, of which $ 80,000.00 was from the proceeds of a loan from Comanche. Such additional contribution entitled him to receive royalties of $ 13.32 per electric vehicle sold until he received additional royalty payments of $ 200,000.00, at which time such royalties would be reduced to $ 6.66 per vehicle. Mr. Morhar executed his copy of the 1981 agreement on October 7, 1981. *292 He contributed $ 25,000.00 to the research fund, of which $ 20,000.00 was from the proceeds of a loan received from Comanche. He was entitled to receive royalties of $ 3.33 per electric vehicle sold until he received royalty payments of $ 50,000.00, at which time such royalties would be reduced to $ 1.67 per vehicle. Mr. Rochelle executed his copy of the 1981 agreement on July 14, 1981. He contributed $ 350,000.00 to the research fund, of which $ 280,000.00 was from the proceeds of a loan received from Comanche. He was entitled to receive royalties of $ 46.62 per electric vehicle sold until he received royalty payments of $ 700,000.00, at which time such royalties would be reduced to $ 23.31 per vehicle. Mr. Rochelle made an additional contribution to the research fund on September 21, 1981. He contributed an addition $ 150,000.00 to such fund, of which $ 120,000.00 was from the proceeds of a loan received from Comanche. Such additional contributions entitled him to receive royalties of $ 19.98 per electric vehicle sold until he received royalty payments of $ 300,000.00, at which time such royalties would be reduced to $ 9.99 per vehicle. All the petitioners executed *293 promissory notes to support the amounts they purportedly borrowed from Comanche in 1981. Such notes were similar to the 1980 notes, except that they provided: The Maker shall at all times be personally liable for the payment of the entire principal hereof. The Maker shall not be personally liable for the payment of interest hereof; however, should the Maker default on the payment of interest when due, he shall forfeit all subsequent royalties due from that time onward under the afore-mentioned Research and Development Agreement (Exhibit 1) and assign the right to receive such royalties to the Payee and shall instruct Electric Auto Corporation (Bahamas) Limited, or its successors to make all subsequent royalty payments directly to the Payee. * * *
The 1981 notes matured 8 years from the date on which they were executed. Electric Auto was able to retain only a small portion of the fees it received from the 1980 and 1981 transactions. Approximately 80 percent of such fees were deposited into the cash collateral account maintained at Artoc to cover the amounts advanced to the participants in the transactions. Approximately 4 percent of the fees were deposited into another *294 account maintained by Electric Auto at Artoc. Approximately 4 percent of the fees were paid as commissions to Mr. Kurtin, to Mr. Gilleran, and to others who promoted the transactions. Electric Auto was left with only 12 percent of the total proceeds to finance its activities and the activities of AAR in the United States and the Bahamas. Before entering into the 1980 and 1981 transactions, the petitioners reviewed copies of the research and development agreements and the promissory notes. In addition, Mr. Kurtin showed potential participants in such transactions copies of a letter written on Comanche stationary and signed by a director of Comanche (the side letter). Such letter written with respect to the 1980 transactions stated: Dear Sir, With reference to the attached Promissory Note dated     1980 for US $    , maturing on    , due to the delay in production of the electric cars by Electric Auto Corp. (Bahamas) Ltd., we hereby agree to grant you three consecutive ten-year extensions of time on this note should it not be paid in full at the end of the first maturity date. In the event that Electric Auto Corp. (Bahamas) Ltd. does not achieve a minimum *295 annual average California sales volume of 2,000 Electric Vehicles during the period 1983-1993, the interest on this note will be considered nonrecourse to the maker of the note. We also agree to cancel this note if at the end of the last maturity date, i.e., 38 years from the date the note was made, Electric Auto Corp. (Bahamas) Ltd., or its successors, has not achieved an annual rate of production on at least 50,000 electrically powered motor vehicles. This letter shall be binding on Comanche Investments N.V. and its successors and assigns. Mr. Baron and Mr. Jay had a copy of the side letter in the file of the documents they collected relating to Electric Auto. Although both such letters contained only the salutation "Dear Sir," both letters refer to the promissory notes executed by Mr. Baron and Mr. Jay. In addition, both letters made specific reference to the dates and amounts of the notes to Comanche executed by them. In 1980, Electric Auto sent a form letter to the petitioners and to other participants in the 1980 transactions which indicated a number of steps which such individuals could take to create the impression that they were engaged in the research and development *296 business. Such letter suggested that the participants register a ficticious name for their company, obtain stationary imprinted with the new company's letterhead, and obtain information from government agencies and other organizations involved in the development of electric vehicles. The letter stated that "The time you devote to your new R&D business will be minimal but the rewards for being on the forefront of new technology can be very great. One of the biggest rewards is that you will be qualified to take R & D tax deductions not only for 1980, but also for 1981 and beyond." Electric Auto subsequently sent a similar letter to the petitioners and other participants in the 1981 transactions. In January 1981, Electric Auto distributed a memorandum to tax attorneys, CPAs, and financial planners, which described the company's research and development program for 1981. Such memorandum included a copy of the 1981 agreement used in such year and a blank copy of an assignment from a contributor to Comanche of royalties due under the program. In addition, the memorandum contained a brief description of the program which indicated that Electric Auto would sell up to 300 "units" of *297 $ 50,000 each to fund its research program and stated that the company would pay royalties of $ 6.66 per unit for each electric vehicle sold in California, or a total of $ 1,998.00 per vehicle. Further, the memorandum contained a cash flow schedule, which detailed the royalties, note payments, taxable income or loss and associated tax results to be expected by a taxpayer in the 50-percent tax bracket. Finally, the memorandum included copies of published articles which described the growing popularity of "R and D tax shelters." There is no evidence that Electric Auto ever directly performed research aimed at developing the Silver Volt. Instead, Electric Auto subcontracted with AAR to perform such research with respect to the 1978, 1979, 1980, and 1981 transactions. However, AAR did not have a fully operational research facility in the Bahamas until the end of 1980. In December 1981, Electric Auto declared royalties to the participants in the 1980 and 1981 transactions based on the purported sale of three Silver Volts to a dealer in California. The participants received no royalty payments as a result of such purported sale. Rather, such amounts were assigned to Comanche and *298 treated as payments on the promissory notes held by it. The purported sale upon which the royalties were based never in fact occurred. The three Silver Volts purportedly sold were not completed and not ready to be sold to the public. Although invoices and transfer documents intended to substantiate the sale were prepared, the dealer never actually took title to the automobiles. Mr. Jay, Mr. Rochelle, and Mr. Ben-Porat relied almost entirely on Mr. Kurtin's opinion as to the business viability of the transactions involving EFP and Electric Auto. There is no indication in the record that they had the promotional material relating to the transactions reviewed by an attorney. There is no evidence that they, or anyone acting on their behalf, ever conducted an investigation of the commercial reasonableness of the sales projections for the Silver Volt or an investigation of the basis for such projections. In addition, there is no indication in the record that any of the petitioners have any formal training in engineering, physics, or chemistry. Finally, there is no evidence that they have had any experience in conducting research and development or supervising such activities. *299 On the petitioners' Federal income tax returns for 1980, they each included a Schedule C relating to their participation in the 1980 Electric Auto transactions. On such schedules, they claimed deductions based upon the cash contributed by them and on the proceeds of the loans received by them. The petitioners claimed deductions for subcontracted research and development, and for various expenses, including wages, utilities, travel and entertainment, and automobile expenses. On the Schedule C filed by the Barons, no amounts were deducted for subcontracted research and development; rather, $ 47,937 was claimed as cost of goods sold. The Schedule Cs filed by the petitioners with their Federal income tax returns for 1981 do not contain specific deductions, as did such schedules filed for 1980. Rather, they reflect lamp sum deductions for research and development. Such deductions were again based upon the cash contributed by the petitioners and on the proceeds of the loans received by them. In the notices of deficiency issued to the Barons, Ben-Porats, Morhars, and Rochelles, the Commissioner disallowed the deductions claimed with respect to the 1980 and 1981 transactions on *300 the grounds that such petitioners failed to establish: (1) That you were engaged in a trade or business during the taxable year within the meaning of Section 174 of the Internal Revenue Code. (2) That the claimed expenditures identifies with a research and development expenditure within the meaning of Section 174 or with a research and development expenditure that would, in any event, be currently deductible by you. (3) That you were "at risk" within the meaning of Section 465 of the Internal Revenue Code for that portion of the claimed expenditures that was financed by an alleged recourse note. (4) That the claimed deduction in the amount of     represents an expenditure for research and development actually undertaken, and (5) That the amounts proven to be expended, if any, for alleged research and development are currently deductible, and are not capital expenditures. In the notice of deficiency issued to the Jays, the Commissioner disallowed the deductions claimed by them with respect to the 1980 and 1981 transactions on the grounds that the "deductions claimed by you for research and development and other expenses *301 with respect to your alleged business activity of research and development of an electric car * * * are not allowable because it has not been established that you were engaged in a trade or business, that the transactions were entered into for profit, that the transactions were entered into for any purpose other than tax avoidance, that the expenses were paid or incurred for the purpose claimed." In addition, the Commissioner determined, either in the notices of deficiency or by amending his answer, that all the petitioners are subject to additions to tax under section 6653(a) for 1980 and under section 6653(a)(1) and (a)(2) for 1981 and to increased interest under section 6621(c). OPINION The first issue for our decision is whether the petitioners are entitled to the deductions claimed by them under section 174(a) with respect to the 1980 and 1981 transactions with Electric Auto. Section 174(a)(1) states, as a general rule, that "research or experimental expenditures which are paid or incurred by * * * [a taxpayer] during the taxable year in connection with his trade or business," may, at the taxpayer's election, be treated as expenses not chargeable to capital account and *302 may be deducted in the taxable year. The provisions of section 174(a)(1) apply to costs paid or incurred by the taxpayer whether the research and experimentation is undertaken directly by him or is carried on in his behalf by another person or organization. Sec. 1.174-2(a)(2), Income Tax Regs.
The Supreme Court established in Snow v. Commissioner,416 U.S. 500 (1974), revg. 482 F.2d 1029 (6th Cir. 1973), affg. 58 T.C. 585 (1972), that the taxpayer need not currently be producing or selling any product in order to obtain a deduction for research and experimental expenses. However, as we observed in Green v. Commissioner,83 T.C. 667 (1984), "For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business." 83 T.C. at 686-687 (emphasis in original). See also Higgins v. Commissioner,312 U.S. 212 (1941); International Trading Co. v. Commissioner,275 F.2d 578 (7th Cir. 1960), *303 affg. a Memorandum Opinion of this Court; Levin v. Commissioner,87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987); Ditunno v. Commissioner,80 T.C. 362 (1983). In Commissioner v. Groetzinger,    U.S.    , 107 S.Ct. 980 (1987), the Supreme Court held that "to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit." 107 S.Ct. at 987. See also Hirsch v. Commissioner,315 F.2d 731 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Green v. Commissioner, supra;Flowers v. Commissioner,80 T.C. 914 (1983). Although a reasonable expectation of profit is not required, the taxpayer must have the intent and objective of realizing a profit. Hirsch v. Commissioner,315 F.2d at 736; Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983). See also sec. 1.183-2(a), Income Tax Regs. *304 "Profit" in this context means economic profit, exclusive of tax savings. Beck v. Commissioner,85 T.C. 557 (1985); Herrick v. Commissioner,85 T.C. 237, 254-255 (1985); Surloff v. Commissioner,81 T.C. 210, 233 (1983). The existence of the required profit objective is usually determined by examining the objective of the entity which has control over the activity in scrutiny. Brannen v. Commissioner,78 T.C. 471, 504-505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Thus, the existence of a profit objective of a partnership is determined at the partnership level. Rosenfeld v. Commissioner,82 T.C. 105, 112 (1984); Brannen v. Commissioner,78 T.C. at 504-505; Goodwin v. Commissioner,75 T.C. 424, 434-439 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982). Similarly, the existence of a profit objective of a joint venture is generally determined at the joint venture level. See Drobny v. Commissioner,86 T.C. 1326, 1342 (1986); Grove v. Commissioner,54 T.C. 799, 801-805 (1970). In this *305 case, however, the petitioners contributed money directly to Electric Auto. By signing the 1980 and 1981 agreements, they did not become partners in a partnership nor members of a joint venture. Because no partnership or joint venture is involved, the intent of each petitioner as to the required profit objective is determinative. See Capek v. Commissioner,86 T.C. 14, 37 (1986). The question whether a taxpayer engages in an activity with the requisite intention of making a profit is one of fact to be resolved on the basis of all the facts and circumstances of the case. Hirsch v. Commissioner,315 F.2d at 737; Dreicer v. Commissioner,78 T.C. at 645. In making this determination, more weight must be given to the objective facts than to the taxpayer's statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Thomas v. Commissioner,84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). The petitioners bear the burden of proving that they possessed the required profit objective. Rule 142(a), Tax Court Rules of Practice and *306 Procedure.[6] See also Boyer v. Commissioner,69 T.C. 521, 537 (1977). The petitioners contend that they entered into the 1980 and 1981 transactions with the requisite profit objective, because such transactions had the bona fide purpose of developing and marketing the Silver Volt. They argue that, by entering into the transactions, they acquired the services of Mr. Aronson, who had considerable experience in the field of electric vehicles. They further claim that they made proper arrangements for the commercial exploitation of the Silver Volt and that the documents executed by them provided adequate protection for their interest in the revenues from such exploitation. On the other hand, the Commissioner argues that the amounts paid or incurred by the petitioners pursuant to the 1980 and 1981 transactions are not deductible under section 174(a) because they did not pay or incur such amounts "in connection with" any trade or business. He contends that the documents executed by the petitioners show that they were not the beneficial owners of the fruits of the Electric Auto *307 research and that they did not have the prospect of engaging in a trade or business in connection with such research. A careful examination of the 1980 and 1981 agreements and other documents executed by the petitioners and a review of their activities with respect to Electric Auto leads us to conclude that they never intended, nor were capable of, engaging in the trade or business of conducting research. We are convinced that the 1980 and 1981 transactions were structured in such a way as to allow Mr. Aronson to raise funds needed to develop the Silver Volt and to leave the petitioners in the restricted role of passive investors. Such transactions enabled Mr. Aronson and Electric Auto to retain effective control over the development, manufacture, and sale of the Silver Volt when such vehicle became commercially marketable, and left the petitioners with only a royalty interest in the Silver Volt and its technology. We first examine the circumstances leading up to the execution of the agreements by the petitioners. Prior to entering into the 1980 and 1981 transactions, the petitioners received no formal offering describing such transactions. The petitioners were only shown *308 copies of the agreements and the promissory notes. In addition, in 1981 Mr. Kurtin had available for their review copies of the memorandum which described the transactions and which described the popularity of research and development tax shelters. Such memorandum also highlighted the tax advantages to be enjoyed by participants in the Electric Auto research program. None of the petitioners had an attorney review the Electric Auto materials before they entered into the transactions. Nor did they take any steps to determine whether the projections of potential Silver Volt sales were feasible. Rather, all of the petitioners, except Mr. Baron, relied exclusively on the recommendations of Mr. Kurtin as to the suitability of the transactions. But Mr. Kurtin himself never investigated the viability of the transactions. Of course, it was not in his interest to do so, since he earned commissions for his efforts in bringing participants to the transactions. If the petitioners had conducted a serious investigation into the viability of the transactions, they would have discovered that such transactions were not all they were represented to be. During trial, the Commissioner offered *309 the testimony and written report of George Frost as an expert opinion regarding the 1980 and 1981 transactions. Mr. Frost has been engaged in the practice of patent law for 40 years, both in private practice and as the director of the Patent Section for the General Motors Corporation (GM). In such position, he was responsible for all of GM's patent and intellectual property matters throughout the world. During his career, he has also been active teaching and writing about patent law and related subjects. At the request of the Commissioner, Mr. Frost prepared an analysis of the 1980 and 1981 transactions. He reviewed the agreements and other promotional materials provided to the petitioners by Electric Auto. He also searched patent records to determine the legal status of the products and technology purportedly acquired by the petitioners. As a result of his review, Mr. Frost concluded that the development agreements executed by the petitioners did not represent a legitimate research and development contract. Mr. Frost noted that the transactions were not entered into in a businesslike manner. While the petitioners signed numerous documents, not one was the product of an *310 arm's-length negotiation. The petitioners were simply presented with a package of documents to sign and never had the opportunity to comment on the provisions of the development agreements, the dollar value of the research contracted for, or the royalties promised in such agreements. Mr. Frost also observed that the agreements expressly provided that the petitioners had no power to control or direct the research activities of Electric Auto. While the agreements required the petitioners to make their entire contribution to the research fund in advance, before any research was performed, they allowed Electric Auto, in its sole discretion, to invest such contributions so long as it saw fit or to spend the money conducting research. Yet, the agreements provided no time schedule for the performance of research by Electric Auto or its subcontractors. Further, they imposed no reporting requirements designed to insure that whatever research was conducted was performed properly and achieved results. Both Mr. Frost and Richard Gerber indicated that a legitimate research and development agreement would not contain a provision allowing unlimited access to research funds without the imposition *311 of time limits or reporting requirements. Even Mr. Jay and Mr. Rochelle admitted that, in their prior business experience, they avoided transactions which called for advance payment of the full amount under the contract and which did not provide for any periodic progress reports by the contractor. Perhaps most disturbing is the fact that the petitioners acquired no ownership interest in the results of the Electric Auto research financed by their contributions. Under the agreements, the petitioners were entitled only to royalties for each electric vehicle sold by Electric Auto or its subsidiaries for use or resale in California. Yet, the royalty interest granted to the petitioners was only a limited one, because the agreements could be easily circumvented by Electric Auto, either by selling Silver Volts outside of California, or by licensing any technology to a third party which would in turn sell the vehicles. Since the sale of each Silver Volt would produce $ 1,998 in royalties, there appears to be a substantial incentive for the company to attempt to avoid paying such royalties. The loans received by the petitioners to fund their Electric Auto contributions also relate to *312 the determination whether they were engaged in a trade or business. See Drobny v. Commissioner,86 T.C. 1326, 1346 (1986). The petitioners argue that they expected to be called upon to repay such loans and deny that such loans were represented to them to be nonrecourse. However, the existence of the side letters raises doubts as to whether the loans to the petitioners from Comanche represented legitimate indebtedness. Mr. Kurtin, who promoted the Electric auto transactions to most of the petitioners, had available such side letters, which extended the maturity dates of the loans by 30 years and provided that the debt would be forgiven altogether if Electric Auto had not reached annual production of 50,000 electric vehicles by the extended date of maturity. Veron Tyler, a businessman and participant in the 1980 and 1981 transactions, testified that Mr. Kurtin showed him a copy of the side letter, along with a copy of the development agreement and promissory note, before he entered into the transactions. Further, both Mr. Jay and Mr. Baron had copies of such letter among their Electric Auto papers. It is likely that all of the petitioners had copies of the side *313 letter or at least knew of its contents. These petitioners were generally experienced businessmen, and we conclude that they would not have executed the purported notes without knowing whether or not they would be required to make good on the notes. It is reasonable to infer that they believed, at the time they entered into the Electric Auto transactions, that they would never have to repay the loans. As part of the transactions with Comanche and Micam, Electric Auto agreed to maintain funds in a cash collateral account at Artoc sufficient to cover the loans made to the petitioners, and in fact the company did so after the petitioners made their contributions to the research fund. In our judgment, the transactions surrounding this circular flow of the loan proceeds had no substance for tax purposes. Such transactions only had the effect of increasing by five times the contributions allegedly made by the petitioners and, correspondingly, the deductions which could be claimed by them. The fabricated nature of these loans designed to enhance the tax benefits of the transactions furnished additional evidence that the transactions were not entered into with an actual and bona fide *314 objective of making an economic profit. The petitioners contend that their participation in the 1978 and 1979 transactions shows that they were in the electric vehicle business with the intent to earn a profit. They argue that such activity supports a conclusion that the expenditures made by them with respect to the 1980 and 1981 transactions were made in connection with a trade or business. However, an examination of the events leading up to the petitioners' investment in the subchapter S corporations involved in the 1978 and 1979 transactions also shows that they did not conduct activities such that they were engaged in a trade or business or ever had the prospect of being so engaged. All the petitioners, except for Mr. Baron, relied heavily on Mr. Kurtin's recommendation as to the commercial viability of the 1978 and 1979 transactions. Mr. Kurtin's recommendation came after he received a report from Richard Gerber, who traveled to the Bahamas to visit Electric Auto's facilities in 1979. At such time, neither Electric Auto nor its research subcontractor, AAR, had produced a workable prototype of the Silver Volt. In fact, neither company even had actual research facilities *315 in the Bahamas. None of the petitioners visited the Electric Auto facilities personally before participating in the 1978 and 1979 transactions. Further, they never took steps to investigate the validity of the patent rights purportedly acquired by the subchapter S corporations in which they invested. They made no effort to determine whether such corporations had clear title to the patents which were the subject of the research purportedly to be conducted by Electric Auto or AAR. Mr. Frost testified that his patent search, which was performed as part of his analysis of the transactions, revealed the original inventors of several of the patents purportedly acquired had never assigned the rights to such patents to the subchapter S corporations. In our judgment, the 1980 and 1981 agreements entered into by the petitioners effectively precluded them from ever having any substantial rights in the results of the Electric Auto research and from ever using the results of such research in connection with a trade or business. We view the petitioners' role to be that of investors, contributing capital to Electric Auto. Their activities have never and will never surpass those of investors. *316 The management of investments is not a trade or business, no matter how extensive or complex the investment portfolio or how much time is required to manage such investments. Higgins v. Commissioner,312 U.S. 212 (1941); Purvis v. Commissioner,530 F.2d 1332 (9th Cir. 1976), affg. per curiam a Memorandum Opinion of this Court; Green v. Commissioner,83 T.C. 667, 689 (1984). A taxpayer who holds securities for long-term appreciation and who seeks current income from dividends and income from such securities, rather than from frequent short-term trades, is an investor. Purvis v. Commissioner,530 F.2d at 1334; Green v. Commissioner,83 T.C. at 689. Under the 1980 and 1981 agreements, the petitioners have only a royalty interest in the proceeds from the sale of electric vehicles by Electric Auto. In our view, such interest in analogous to that of an individual's interest in the earnings of a corporation in which he owns stock. Therefore, since the petitioners did not incur research and experimental expenses "in connection with" a trade or business, they are not entitled to deductions for such *317 expenses in 1980 and 1981. Spellman v. Commissioner,    F.2d     (7th Cir., April 21, 1988), affg. a Memorandum Opinion of this Court; Levin v. Commissioner,87 T.C. 698, 728 (1986), affd. 832 F.2d 403 (7th Cir. 1987); Green v. Commissioner,83 T.C. at 689. Because we find that the expenditures by the petitioners were not made in connection with a trade or business, we need not address the alternative positions advanced by the Commissioner. [7] In addition, we need not address the petitioners' other arguments, because such arguments are based upon a threshold finding that the Electric Auto expenditures were made in connection with a trade or business. [8]
*318 The next issue for our decision is whether the petitioners are liable for the addition to tax for negligence under section 6653(a) for 1980 and section 6653(a)(1) and (a)(2) for 1981. Such addition to tax is imposed if any part of the underpayment of tax is due to negligence or intentional disregard of rules and regulations. Negligence, within the meaning of section 6653(a), constitutes a lack of due care, or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). The petitioners bear the burden of proving the Commissioner's determination that they are subject to the negligence addition to be erroneous. Rule 142(a); Courtney v. Commissioner,28 T.C. 658, 669 (1957). After carefully considering all the evidence before us, we conclude that the imposition of the negligence addition is justified. In our judgment, the petitioners ignored numerous indications that the Electric Auto transactions were not viable business ventures. The petitioners did not appear to be troubled by the fact that the 1980 and 1981 agreements required full payment of their contributions *319 in advance. They were also unconcerned that the agreements failed to provide for a time schedule for the performance of research and imposed no reporting requirements to insure that research was properly performed. To increase their claimed deductions, they executed the purported notes without expecting to be called upon to pay such notes. Finally, the petitioners executed the agreements even though such agreements expressly provided that they received no ownership interest in the result of the Electric Auto research and would be compensated only with royalties on sales of an electric vehicle which had little prospect of becoming commercially viable. Despite such indications that the Electric Auto transactions were not all they were represented to be, the petitioners never consulted an attorney to determine what their rights were under the agreements. All of the petitioners are knowledgeable and successful businessmen and professionals. We cannot believe that they would not seek such protection in other business ventures in which they participate. For them to fail to further investigate the Electric Auto transactions in light of obvious warning signs seems to us to constitute *320 a lack of due care or, worse, an intentional disregard of the lack of commercial viability of such transactions. The final issue for our decision is whether the deductions claimed by the petitioners with respect to their Electric Auto activities resulted in substantial underpayments of tax attributable to tax motivated transactions within the meaning of section 6621(c) and that they are therefore subject to the additional interest provided by such section. Since the Commissioner raised such issue as to the Jays and Ben-Porats only be amending his answer, he bears the burden of proof on the issue as to them. Rule 142(a). The other petitioners bear the burden of proving the Commissioner's determination to be erroneous. Rule 142(a). Section 6621(c) provides "with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest" shall be 120 percent of the standard rate established under section 6601(b). Such increased rate applies to interest accruing after December 31, 1984. Rose v. Commissioner,88 T.C. 386, 426 (1987), on appeal (6th Cir., Dec. 14, 1987). Section 6621(c) applies to those transactions which *321 are specifically defined to be tax motivated in the Code and the regulations. The temporary regulations define the term "tax motivated transactions" to include "Any deduction disallowed for any period under section 183, relating to an activity engaged in by an individual * * * that is not engaged in for profit." Sec. 301.6621-2T, Q-4, and A-4, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984). See Soriano v. Commissioner,90 T.C. 44 (1988); Mark v. Commissioner,T.C. Memo. 1988-187. In this case, we have held that the petitioners are not entitled to the deductions claimed by them under section 174 because they were not engaged in a trade or business with respect to the Electric Auto transactions with an actual and bona fide economic profit objective and that they were motivated by tax benefits. Therefore, in our view, the Electric Auto transactions were tax motivated transactions within the meaning of section 6621(c), and the Commissioner is entitled to additional interest on the interest accruing after December 31, 1984. See Soriano v. Commissioner, supra.
An order restoring docket No. 3362-85 to *322 the general docket for further disposition will be issued. Decisions will be entered for respondent in docket Nos. 12700-85, 12705-85, 24950-85, and 44006-85.
Footnotes
1. Cases of the following petitioners have been consolidated herewith: Josef Ben-Porat and Claire Ben-Porat, docket No. 12700-85; Ben Rochelle and Estate of Jane Beebe Rochelle, Deceased, Ben Rochelle, Executor, docket No. 12705-85; Gerald P. Baron and Bonnie Baron, docket No. 24950-85; and Irvin L. Morhar and Janet Morhar, docket No. 44006-85. ↩
2. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
3. The Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 682-83, sec. 144, added sec. 6621(d) to provide for increased interest on substantial understatements attributable to tax motivated transactions. Such increased amount applies to interest accruing after December 31, 1984. The Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744, sec. 1511(a), redesignated sec. 6621(d) as sec. 6621(c)↩. 4. The Revenue Act of 1978, Pub. L. 95-600, sec. 202, 92 Stat. 2763, 2816, extended the limitations on deductible losses contained in the "at risk" rules to subchapter S corporations. Such provision generally applied to tax years beginning after Dec. 31, 1978. Sec. 204(a), 92 Stat. 2817. ↩
5. The Commissioner contends that the purported contributions should not be treated as such for tax purposes. For convenience, we shall refer to them as contributions without intending to decide such issue. ↩
6. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure. ↩
7. On brief, the Commissioner argues that the petitioners were not at risk for amounts purportedly borrowed from Micam and Comanche and that therefore such amounts cannot support deductions under sec. 174↩. 8. On brief, the petitioners raise the issues whether they are entitled to use the accrual method to account for their Electric Auto activity and whether they are entitled to accrue the amounts purportedly borrowed to finance their contributions to Electric Auto. In addition, the petitioners alleged in their petitions that they are entitled to deductions for casualty or theft losses in the amounts of the cash contributed by them to Electric Auto. They failed to mention such issue in their trial memorandum, presented no evidence on such issue at trial, and made no arguments with respect to such issue on brief. For such reason, we conclude that they have abandoned their claim for casualty loss deductions. ↩